AO 91 (Rev. 11/11) Criminal Complaint     AUSA Margaret A. Steindorf (312) 353-3540

**FILED**
6/27/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>JESUS SANCHEZ | CASE NUMBER: 23-cr-00374<br><br>**UNDER SEAL** |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about June 22, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 922(g)(1) | knowing that he had previously been convicted of a crime punishable by a term of imprisonment exceeding one year, did knowingly possess, in and affecting interstate commerce, a firearm, namely, a Para-Ordnance, model 14.45 LDA semiautomatic handgun, bearing serial number DA1992, which firearm had traveled in foreign commerce prior to defendant's possession of the firearm |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

PATRICK FAHEY (Affiliate)
Digitally signed by PATRICK FAHEY (Affiliate)
Date: 2023.06.27 14:21:01 -05'00'

Patrick Fahey, Task Force Officer
Task Force Officer, Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: June 27, 2023

*Heather K. McShain*
*Judge's signature*

City and state: Chicago, Illinois     HEATHER K. MCSHAIN, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Patrick Fahey, being duly sworn, state as follows:

1. I am a Chicago Police Officer and have been so employed since October of 2003. Since January of 2018, I have been deputized as a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF"). My current responsibilities include the investigation of federal firearms offenses, including unlawful possession of firearms or ammunition by convicted felons.

2. This affidavit is made in support of:

    a. a criminal complaint alleging that Jesus SANCHEZ has committed the offense of unlawful possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g)(1) (the "Subject Offense"); and

    b. an application for a warrant to search the residence located at 6629 S. Oakley Avenue, Chicago, Illinois 60634, which is a premises used by Jesus SANCHEZ to store firearms that he unlawfully possesses and distributes to others (as explained below), described further in Attachment A (the "**Subject Premises**"), for evidence, instrumentalities, fruits, and contraband, described further in Attachment B, concerning the Subject Offense.

3. The statements in this affidavit are based on multiple sources, including but not limited to: my personal knowledge; my review of reports and documents related to this investigation; my review of audio and video recordings related to this investigation; conversations with others who have knowledge of the events and circumstances described in this affidavit; my review of law enforcement databases; my training and experience and the training and experience of other agents with

whom I work; and information provided to me by persons with knowledge regarding relevant facts.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint and securing a warrant to search the **Subject Premises**, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe establish probable cause to believe that JESUS SANCHEZ has committed and is committing the Subject Offense. I have further set forth facts that I believe establish probable cause to believe that evidence, instrumentalities, fruits, and contraband of the Subject Offense are located at the **Subject Premises**.

## PROBABLE CAUSE SUMMARY

5. In summary, and as set forth in more detail below, between May 11, 2023 and June 22, 2023, SANCHEZ, a convicted felon, sold seven firearms on five different occasions to an ATF undercover agent (the "UC") who was in the company of an ATF Confidential Source ("CS-1")[1].

6. More specifically, and as set forth in more detail below, SANCHEZ met with the UC and CS-1 to conduct each of the five transactions at the same meeting location on the 6500 block of South Western Avenue, Chicago, Illinois. During three

---

[1] CS-1 has one felony conviction for Aggravated Unlawful Use of a Weapon/Loaded/No FCCA/FOID. CS-1 has worked with the ATF for approximately one year and five months. CS-1 is cooperating with ATF in exchange for monetary consideration and has been paid approximately $12,200.00 for aiding ATF investigations. Law enforcement believes CS-1 to be a reliable source of information because information provided by CS-1 has been corroborated by recorded communications and surveillance and has led to the seizure of firearms.

of the transactions, law enforcement observed SANCHEZ come out of the **Subject Premises**, arrive at the meet location, and exchange firearms for money with the UC. Following four of the transactions, law enforcement observed SANCHEZ return to the **Subject Premises**.

I. **FACTS SUPPORTING PROBABLE CAUSE THAT JESUS SANCHEZ HAS COMMITTED THE SUBJECT OFFENSE**

7. As described in more detail below, SANCHEZ sold seven firearms to the UC approximately on five different dates between May 11, 2023 and June 22, 2023.

    A. **On May 11, 2023, SANCHEZ Sold a Firearm to the UC**

8. On May 11, 2023, the UC, who was equipped with an audio/video recording device, and CS-1 met with SANCHEZ[2] for the purpose of purchasing a firearm from SANCHEZ for $1,100. According to the UC, the UC used his/her undercover vehicle to drive the UC and CS-1 to meet SANCHEZ on the 6500 block of South Western Avenue, Chicago, Illinois ("Location A").

9. At approximately 1:38 pm,[3] according to the UC, a black Pontiac four door sedan bearing Illinois license plate DG18885 ("Vehicle 1") driven by SANCHEZ arrived and parked in the vicinity of the undercover vehicle. According to the UC, an additional male occupant ("Individual A") was seated in the front passenger seat of Vehicle 1.

---

[2] Law enforcement identified SANCHEZ by comparing a known booking photograph of SANCHEZ to the individual who met with the UC on or about May 11, 2023.

[3] The law enforcement surveillance unit's clock was two to three minutes behind the actual time of day. Therefore, throughout this affidavit, the times referenced by the law enforcement surveillance unit for each of the firearms transactions are approximately two to three minutes slower than times referenced by the UC and surveillance video.

10. According to the UC, SANCHEZ exited the driver's seat of Vehicle 1 and approached the driver's side of the undercover vehicle. According to the UC and the audio/video recording, the UC informed SANCHEZ that he/she had the money to purchase the firearm, after which SANCHEZ approached the front passenger side of Vehicle 1. According to the UC and the audio/video recording, the front passenger window of Vehicle 1 was rolled down and Individual A handed SANCHEZ an AR-style rifle. According to the UC and the audio/video recording, the UC then handed SANCHEZ $1,100 in ATF funds in exchange for the AR-style rifle. According to UC and the audio/video recording, the UC and SANCHEZ then discussed the purchase price of different quantities of narcotics.

11. Law enforcement later determined the firearm given to the UC by SANCHEZ and Individual A was a Smith & Wesson, model M&P 15-22 semiautomatic rifle, bearing serial number LAC6591.

**B. On June 1, 2023, SANCHEZ Sold a Firearm to the UC**

12. On June 1, 2023, the UC, who was equipped with an audio/video recording device, and CS-1 met with SANCHEZ for the purpose of purchasing a firearm from SANCHEZ for $1,300. According to the UC, the UC used his/her undercover vehicle to drive the UC and CS-1 to Location A and awaited the arrival of SANCHEZ.

13. At approximately 1:12 pm, according to the UC, SANCHEZ walked up to the undercover vehicle and entered the back seat. According to the UC and the audio/video recording, once inside the undercover vehicle, SANCHEZ removed a black pistol from his waistband and handed it to the UC. According to the UC, the

4

UC inspected the firearm and later provided SANCHEZ with $1,300 in ATF funds to purchase the firearm. According to the UC and the audio/video recording, during the transaction, SANCHEZ and the UC discussed the purchase price of narcotics and the manufacturing of cocaine into crack cocaine.[4]

14. According to the UC, at approximately 1:14 pm, SANCHEZ exited the undercover vehicle, walked back into the alley he appeared from, and continued south bound away from Location A. At approximately 1:15 pm, surveillance officers observed SANCHEZ enter the **Subject Premises**. Law enforcement was not able to follow SANCHEZ all the way from Location A to the **Subject Premises** because SANCHEZ walked down an alley, but the **Subject Premises** is located approximately 0.3 miles from Location A, according to Google Maps.

15. Law enforcement later determined the firearm to be a Glock GMBH model 22 Gen4 semiautomatic handgun, bearing serial number PWZ018. Law enforcement also observed a separate serial number, BAHT614, depicted on the slide and barrel of the firearm.

---

[4] Unless otherwise noted, statements from the audio/video recording are in summary and not verbatim. The language that is quoted from the recorded conversations throughout this affidavit is based upon a preliminary review of the recorded conversations and not on final transcripts of the recorded conversations. Summaries and excerpts do not include all statements or topics covered during the course of the recorded conversations. At various points in the affidavit, I have included my interpretation of words and phrases used in recorded conversations. My interpretations are based on the contents and context of the recorded conversations, events occurring before and after the conversations, my knowledge of the investigation as a whole, information obtained from CS-1 and the UC, my experience and training, and the experience and training of other law enforcement agents in this investigation.

### C. On June 2, 2023, SANCHEZ Sold a Firearm to the UC

16. On June 2, 2023, the UC, who was equipped with an audio/video recording device, accompanied by CS-1, met with SANCHEZ for the purpose of purchasing a firearm from SANCHEZ for $1,400. According to the UC, the UC used his/her undercover vehicle to drive the UC and CS-1 to Location A and awaited the arrival of SANCHEZ.

17. At approximately 1:47 pm, surveillance officers observed SANCHEZ exit the **Subject Premises** and walk northbound in the direction of Location A. SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to Location A.

18. At approximately 1:52 pm, according to the UC, SANCHEZ walked up to the undercover vehicle and entered the vehicle. According to the UC, once inside the undercover vehicle, SANCHEZ retrieved a pistol from his front left pants pocket. According to the UC and the audio/video recording, SANCHEZ stated that he needed ammunition from the loaded firearm and began ejecting multiple rounds from the firearm before providing it to the UC to inspect. According to the UC, as the UC was inspecting the firearm, SANCHEZ retrieved a clear plastic baggie containing a white substance from his front right pants pocket and handed it to the UC. According to the UC and the audio/video recording, SANCHEZ provided the baggie containing suspect narcotics to the UC as a sample, free of charge. Law enforcement later conducted a field test of the suspect narcotics and determined that the substance tested positive for cocaine.

19. According to the UC and the audio/video recording, during this meeting,

SANCHEZ informed the UC that SANCHEZ had previously fired the firearm himself. According to the UC, the UC then provided SANCHEZ with $1,400 of ATF funds to purchase the firearm.

20. According to the UC and the audio/video recording, during the transaction, the UC and SANCHEZ discussed narcotics. The UC asked SANCHEZ if he was still interested in the "cook," referring to the manufacture of cocaine into crack cocaine. SANCHEZ replied that he was and stated, "I kinda fucked my shit up when I tried to do it last time," which the UC understood to mean that SANCHEZ manufactured the crack cocaine improperly last time.

21. According to the UC, SANCHEZ exited the undercover vehicle at approximately 1:53 pm and walked back into the alley. SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to the **Subject Premises**. At approximately 1:53 pm, surveillance officers observed SANCHEZ enter the **Subject Premises**.

22. Law enforcement later determined that the firearm SANCHEZ sold to the UC was a Glock GMBH model 30 Gen4 semiautomatic handgun, bearing serial number BKXA473.

    **D.    On June 15, 2023, SANCHEZ Sold Three Firearms to the UC**

23. On June 15, 2023, the UC, who was equipped with an audio/video recording device, accompanied by CS-1, met with SANCHEZ for the purpose of purchasing three firearms from SANCHEZ for $2,200. According to the UC, the UC used his/her undercover vehicle to drive the UC and CS-1 to Location A and awaited the arrival of SANCHEZ.

7

24. At approximately 1:24 pm, surveillance officers observed SANCHEZ exit the **Subject Premises**, while carrying a backpack, and proceed northbound towards Location A. SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to Location A.

25. At approximately 1:29 pm, according to the UC, SANCHEZ walked up to the undercover vehicle and entered the vehicle. According to the UC and the audio/video recording, once inside of the undercover vehicle, SANCHEZ removed three firearms from his backpack and provided them to the UC for inspection: a .22 caliber firearm, a 9mm firearm, and a .380 caliber firearm. According to the UC, while inspecting the firearms, the UC noticed the .22 caliber firearm did not decock[5] and did not have a magazine inserted in the firearm. According to the UC and the audio/video recording, when the UC asked SANCHEZ if he knew what the problem was with the firearm, SANCHEZ stated that the hammer would not go forward. According to the UC and the audio/video recording, the UC asked SANCHEZ if he had a "clip," meaning magazine, for the firearm. According to the UC and the audio/video recording, SANCHEZ stated, "I got a clip and some bullets for you…I can go get." According to the UC and the audio/video recording, the UC then paid SANCHEZ for the .380 caliber and 9mm firearm using $1,900 in ATF funds, and asked SANCHEZ if he would sell the .22 caliber firearm for $300 instead of the initial

---

[5] According to the UC, the hammer for the firearm was locked in the rear position. Therefore, if someone attempted to fire the weapon, the hammer would not come forward and strike the firing pin, which should cause a round of ammunition to be fired from the firearm.

8

$400 SANCHEZ had requested. According to the UC and the audio/video recording, SANCHEZ related he needed to speak with the individual who he was selling the firearm for. According to the UC and the audio/video recording, SANCHEZ used a blue iPhone with a clear case and gold bumper around the phone to place a phone call to the individual, but the call was not answered. According to the UC and the audio/video recording, after the failed attempt to contact the individual, SANCHEZ agreed to sell the .22 caliber firearm to the UC for $300.

26. According to the UC and the audio/video recording, during the meeting, SANCHEZ told the UC that he had a "Mack," referring to a Mack 11 firearm, which is a type of pistol capable of accepting a high-capacity magazine, but SANCHEZ was not willing to sell it yet. According to the UC and the audio/video recording, SANCHEZ stated, "I was really gonna get down on somebody for six G and fuck them over…not ya'll, but I'll find somebody." According to the UC, the UC understood this statement to mean that SANCHEZ was planning to use the Mack 11 firearm to on rob someone for $600.

27. According to the UC and the audio/video recording, SANCHEZ stated that he would go back to his residence to retrieve the magazine and ammunition for the .22 caliber firearm for the UC. According to the UC, at approximately 1:32 pm, SANCHEZ exited the undercover vehicle and walked back to the alley carrying his backpack. The UC and CS-1 remained inside the undercover vehicle, which was parked at Location A. Surveillance officers were not able to maintain surveillance of SANCHEZ as he walked down the alley towards the **Subject Premises**. At

9

approximately 1:33 pm, surveillance officers observed SANCHEZ arrive and enter the **Subject Premises**. At approximately 1:35 pm, surveillance officers observed SANCHEZ exit the **Subject Premises** with his backpack, and walk in the direction of Location A. Again, SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to Location A.

28. According to the UC, at approximately 1:41 pm, SANCHEZ walked up to the undercover vehicle and entered the vehicle. According to the UC and the audio/video recording, once inside of the undercover vehicle, SANCHEZ handed a loaded magazine for the .22 caliber firearm to the UC, after which the UC provided $300 in ATF funds to SANCHEZ for the .22 caliber firearm. According to the UC and the audio/video recording, SANCHEZ then retrieved a box of .22 caliber Winchester Western ammunition from his front left pants pocket and handed it to the UC.

29. According to the UC and the audio/video recording, after the transaction was completed, the UC asked SANCHEZ if he was still interested in the "work," meaning crack cocaine, and "cooking" it, referring to the manufacturing of cocaine into crack cocaine. According to the UC and the audio/video recording, SANCHEZ responded that he was still interested in meeting the UC to manufacture crack cocaine. According to the UC and the audio/video recording, SANCHEZ used the blue iPhone with a clear case and gold bumper around the phone to show the UC photographs of a Glock pistol and the Mack 11 firearm that SANCHEZ had on his

phone. According to the UC and the audio/video recording, SANCHEZ stated that the firearm in the photo was a semiautomatic Mack 11 and not fully automatic.

30. At approximately 1:44 pm, SANCHEZ exited the undercover vehicle and proceed back into the alley on foot. According to surveillance officers, SANCHEZ arrived at and entered the **Subject Premises** at approximately 1:46 pm.

31. Law enforcement later determined that the firearms SANCHEZ sold to the UC were a Sig-Sauer model P230SL semiautomatic handgun, bearing serial number S004802, a FIE model E22 semiautomatic handgun, bearing serial number AB21287, and a CZ (Ceska Zbrojovka), model CZ75B semiautomatic handgun, bearing serial number 2838N.

E. **On June 22, 2023, SANCHEZ Sold One Firearm to the UC**

32. On June 22, 2023, the UC, who was equipped with an audio/video recording device, accompanied by CS-1, met with SANCHEZ for the purpose of purchasing one firearm from SANCHEZ for $1,450. According to the UC, the UC used his/her undercover vehicle to drive the UC and CS-1 to Location A and awaited the arrival of SANCHEZ.

33. According to surveillance video that was monitored in real-time, at approximately 10:00 am, SANCHEZ exited the **Subject Premises** carrying a backpack, and walked northbound towards Location A. SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to Location A.

34. At approximately 10:03 am, according to the UC, SANCHEZ walked up to the undercover vehicle and entered the vehicle. According to the UC and the

11

audio/video recording, once inside of the vehicle, SANCHEZ removed a .45 caliber firearm from his backpack and handed it to the UC for inspection. According to the UC and the audio/video recording, while inspecting the firearm, SANCHEZ removed a second firearm, believed to be a Ruger .380 caliber pistol, from the backpack and showed it to the UC. According to the UC and the audio/video recording, the UC attempted to purchase the second firearm, but SANCHEZ explained that he was not selling the Ruger firearm at this time. According to the UC and the audio/video recording, the UC then provided SANCHEZ with $1,450 in ATF funds for the .45 caliber firearm. According to the UC and the audio/video recording, after showing the Ruger firearm to the UC, SANCHEZ put the firearm in his left front pants pocket.

35. According to the UC and the audio/video recording, during the meeting, the UC and SANCHEZ discussed the manufacturing of crack cocaine and the purchase of additional firearms. According to the UC and the audio/video recording, SANCHEZ also asked the UC if they were interested in purchasing fireworks. According to the UC and the audio/video recording, SANCHEZ used a blue iPhone without a case to show the UC different photographs of fireworks.

36. At approximately 10:08 am, SANCHEZ exited the undercover vehicle and walked back to the alley. SANCHEZ walked through an alley and, as a result, surveillance officers were not able to maintain constant surveillance of SANCHEZ as he walked to the **Subject Premises**. According to surveillance video, monitored in real-time, at approximately 10:12 am, SANCHEZ arrived at and entered the **Subject Premises** while still in possession of the backpack.

37. Law enforcement later determined that the firearm that SANCHEZ sold to the UC was a Para-Ordnance, model 14.45 LDA semiautomatic handgun, bearing serial number DA1992.

**F. SANCHEZ is a Convicted Felon.**

38. According to criminal history records for SANCHEZ, he is a convicted felon on parole. Specifically, on or about October 1, 2021, SANCHEZ was convicted of (1) Aggravated Domestic Battery/Strangle in the Circuit Court of Cook County and sentenced to four years' imprisonment; and (2) Aggravated UUW/Loaded/No FCCA/No FOID in the Circuit Court of Cook County and sentenced to one year of imprisonment. On or about the same date, SANCHEZ was also convicted of Aggravated UUW/Loaded/No FCCA/No FOID in the Circuit Court of Cook County and sentenced to one year of imprisonment. SANCHEZ is currently on parole for these convictions.

39. According to information obtained from the Illinois Department of Corrections, SANCHEZ served more than one year in prison for the above convictions.

**G. The Firearms SANCHEZ Unlawfully Possessed Traveled in Interstate or Foreign Commerce.**

40. On or about June 26, 2023, an ATF Special Agent who is a certified interstate nexus ATF Special Agent for firearms and ammunition, examined the following firearms and determined that they were all manufactured outside of the state of Illinois:

    a. Smith & Wesson, model M&P 15-22 semiautomatic rifle, bearing serial number LAC6591, purchased from SANCHEZ on May 11, 2023;

13

    b.    Glock GMBH, model 22Gen4 semiautomatic handgun, bearing serial number PWZ018, purchased from SANCHEZ on June 1, 2023. [6]

    c.    Glock GMBH, model 30Gen4 semiautomatic handgun, bearing serial number BKXA473, purchased from SANCHEZ on June 2, 2023.

    d.    Sig-Sauer, model P230SL semiautomatic handgun, bearing serial number S004802, purchased from SANCHEZ on June 15, 2023.

    e.    FIE, model E22 semiautomatic handgun, bearing serial number AB21287, purchased from SANCHEZ on June 15, 2023

    f.    CZ (Ceska Zbrojovka), model CZ75B semiautomatic handgun, bearing serial number 2838N, purchased from SANCHEZ on June 15, 2023.

    g.    Para-Ordnance, model 14.45 LDA semiautomatic handgun, bearing serial number DA1992, purchased from SANCHEZ on June 22, 2023.

41.    The firearm listed in the complaint, the Para-Ordnance, model 14.45 LDA semiautomatic handgun, bearing serial number DA1992, was manufactured in Canada. Therefore, in order for the foregoing firearms to have been recovered in Illinois, they moved in interstate or foreign commerce.

### E. SANCHEZ Does Not Possess a Valid Federal Firearms License to Sell Firearms.

42.    Based on my training and experience, I know that federal law requires that a firearms dealer engaged in the business of dealing in firearms be licensed by

---

[6] The Glock firearm purchased on or about June 1, 2023 bears two different serial numbers. The lower receiver of the firearm bears serial number PWZ018 and the barrel and slide of the firearm bear serial number BAHT614. Based on my training and experience, this indicates that the Glock firearm purchased from SANCHEZ was assembled with parts from two different firearms.

14

ATF. According to information received from the ATF Federal Firearms Licensing Center, SANCHEZ does not possess a valid Federal Firearms License (FFL). Additionally, according to law enforcement databases, SANCHEZ does not possess a valid Illinois Firearms Owners Identification (FOID) card or Concealed Carry License (CCL).

F.   **The Subject Premises**

43.   During the investigation, law enforcement identified the **Subject Premises** as a premises used by SANCHEZ in furtherance of his unlawful possession and dealing of firearms. As described above, law enforcement surveillance observed SANCHEZ exit the **Subject Premises** before transporting and selling firearms to the UC at Location A on June 2, 20223, June 15, 2023 and June 22, 2023. On June 15, 2023, SANCHEZ briefly left his meeting with the UC to travel to the **Subject Premises** to retrieve a magazine and ammunition for the UC. After the firearm transactions on June 1, 2023, June 2, 2023, June 15, 2023 and June 22, 2023, SANCHEZ returned to the **Subject Premises** within minutes of conducting the firearm sales.

44.   According to records obtained from the Illinois Department of Corrections, the **Subject Premises** is SANCHEZ's current parole address.

45.   Based on my training and experience, the training and experience of other law-enforcement members with whom I have consulted, and my experience in this investigation, I believe SANCHEZ uses the **Subject Premises** to store firearms and ammunition that he intends to sell to others. Further, because law enforcement surveillance observed SANCHEZ walk back to the **Subject Premises** after three

15

separate transactions, I believe SANCHEZ likely stores proceeds obtained from the firearm transactions in the **Subject Premises**. As such, I believe SANCHEZ stores evidence, instrumentalities, fruits, and contraband related to possessing and distributing firearms within the **Subject Premises**.

## CONCLUSION

46. For all the reasons described above, I respectfully submit that there is probable cause to believe that Jesus SANCHEZ has committed the offense of unlawful possession of a firearm by a felon, in violation of Title 18, United States Code, Section 922(g)(1).

47. Further, based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, fruits, and contraband relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Premises**, more particularly described in Attachment A.

FURTHER AFFIANT SAYETH NOT.

PATRICK FAHEY
(Affiliate)
Digitally signed by PATRICK FAHEY (Affiliate)
Date: 2023.06.27 14:21:47 -05'00'

Patrick Fahey
Task Force Officer Special Agent, Bureau of Alcohol, Tobacco, Firearms & Explosives

Sworn to and affirmed by telephone the 27th day of June, 2023

HEATHER K. MCSHAIN
United States Magistrate Judge

16